MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: JEAN-DAVID BARNEA
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. (212) 637-2679
Fax. (212) 637-2717

---

ROBERT F. ALMEIDA and ROBERT
F. ALMEIDA as the assignee of JASON
JOSEPH,

                              Plaintiffs,

                    -v-

THE UNITED STATES DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT, and THE HON.
STEVEN PRESTON, as Secretary
of the United States Department of
Housing and Urban Development,

                              Defendants.

08 Civ. 04582 (SCR)

ECF Case

---

## DECLARATION OF WILLIAM H. MELVIN

I, William H. Melvin, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury as follows:

1.    I am the Director of the United States Department of Housing and Urban Development ("HUD") Multifamily Property Disposition Center located in Atlanta, Georgia. As Director, I am responsible for all foreclosure and sales disposition activities of HUD Multifamily projects including both residential and commercial properties located in HUD's New England, New Jersey/New York, Mid-Atlantic, and Southeast/Caribbean Offices. I make this declaration in support of HUD's motion to dismiss the complaint in the above-captioned action. The

statements I make in this declaration are made on the basis of personal knowledge, my review of

HUD's administrative record (including those documents received from HUD's designated

foreclosure commissioner) relating to the April 26, 2002 foreclosure sale of HUD's mortgage on

Tappan Zee Manor (which had originally been scheduled for March 21, 2002), and other

information I have received in the performance of my official duties.

2.      On or about April 26, 2002, Robert Almeida and Jaison Joseph executed an

undated document, entitled "ATTACHMENT B: TERMS AND REQUIREMENTS OF

FORECLOSURE SALE—ACKNOWLEDGEMENT BY BIDDER," in connection with their

successful bid to purchase Tappan Zee Manor.  A true and correct copy of this document is

attached to this declaration as Exhibit A.

3.      On or about September 20, 2002, counsel for the parties to a lawsuit in the United

States District Court for the Southern District of New York concerning the bid mentioned above

(including HUD), captioned *JAISON JOSEPH, successful bidder, Plaintiff – against – JOHN*

*CARRO, as Foreclosure Commissioner acting on behalf of the Secretary of the Department of*

*Housing and Urban Development, HON. MEL MARTINEZ, as Secretary of the U.S.*

*DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and ROBERT ALMEIDA,*

*successful bidder, No. 02 Civ. 6133 (CLB)*, executed a document entitled "STIPULATION OF

SETTLEMENT AND DISMISSAL," which was filed with the court.  A true and correct copy of

this document is attached to this declaration as Exhibit B.

4.      On or about October 4, 2002, Mr. Almeida and I executed a document entitled

"ATTACHMENT C: FORECLOSURE SALE USE AGREEMENT," in connection with the

closing of title on Tappan Zee Manor.  A true and correct copy of this document is attached to

2

this declaration as Exhibit C.

5.     On or about February 6, 2008, Louis U. Gasparini, Esq., Mr. Almeida's counsel, wrote a letter to Jennifer H. Harry, Esq., an Attorney-Advisor in HUD's Atlanta Office of Counsel, seeking repayment of the extension fees his client had paid in connection with the purchase of Tappan Zee Manor several years earlier.  A true and correct copy of this letter is attached to this declaration as Exhibit D.

6.     On or about February 14, 2008, I wrote a responsive letter to Mr. Gasparini.  A true and correct copy of this letter is attached to this declaration as Exhibit E.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed this 12th day of August 2008, in Atlanta, Georgia.

WILLIAM H. MELVIN
Director, Multifamily Property Disposition Center
U.S. Department of Housing and Urban Development

**ATTACHMENT B**
**TERMS AND REQUIREMENTS OF FORECLOSURE SALE -**
**ACKNOWLEDGMENT BY BIDDER**

**PART I**

**1.    Bid Price**

The Undersigned, _____,(the "Bidder")

submits a bid of _____dollars ($          )

at the foreclosure sale of _____(the "Project", the legal
description of which is included as Exhibit 1) to be paid as follows:

      a.     $75,000     in the form of a money order, cashier's or other bank check, as
earnest money, which has been paid at the foreclosure sale to the
person that conducts the foreclosure sale, and which shall not earn
interest (the "Deposit"), and

      b.     $_____    the balance, to be paid by the Bidder at Closing, in the form of a
cashier's or other bank check in accordance with this
Acknowledgment.  The Closing will be held at a place, date and
time established in accordance with Section 3 below (the
"Closing").

      c.     In addition to the above, the Bidder will be required to pay at Closing all closing
costs,  regardless of local custom, and, where applicable, other deposits to
reserve and/or letters of credit as described in Riders incorporated herein, the
Invitation for Bid (Invitation), and the Foreclosure Sale Use Agreement (Use
Agreement).

**PART II**

If selected as the Bidder at or after the foreclosure sale, the Bidder, by executing this
document (the "Acknowledgment"), acknowledges that he/she must comply with the following
requirements as a condition to purchasing the Project:

**1.    Acknowledgment of Terms**
Bidder affirms that he/she has full knowledge of the all terms, conditions and requirements
contained in this Acknowledgment and documents referred to herein, the Invitation and its
Attachments, and the Notice of Default and Foreclosure Sale.  Bidder must execute this
document and initial all riders thereto.

**2.     Execution of Use Agreement**

At Closing, Bidder will, in addition to any other documents, execute the Foreclosure Sale Use Agreement and all of the Exhibits to the Use Agreement as contained in the Invitation. Such documents will control the use of the Project for a specified period and will be recorded with the Deed and run with the land.

**3.     Previous Participation Certification**

The High Bidder must submit within two business days of the foreclosure sale, a completed and executed Previous Participation Certification (Form HUD-2530) for the proposed owner to the HUD Field Office contact stated in the Invitation for Bid.

**4.     Establishment of Closing Date, Time and Place**

a.     Time is of the essence.

b.     HUD will notify the Bidder and the person conducting the foreclosure sale (the "Foreclosure Official") after HUD determines that the Bidder has been approved to purchase this project under the Previous Participation Certification procedure. The Foreclosure Official will establish a time and date for the Closing. The Closing shall be within 30 days of such notification, unless extended pursuant to Section 8.

c.     The Closing will take place at the HUD office stated in the Invitation or at such other place as my be agreed upon between HUD and the Foreclosure Official.

**5.     Closing, Closing Expenses and Transfer of Possession**

a.     The sale shall be effective upon Closing.

b.     Bidder shall pay all closing costs and expenses, irrespective of local custom.

c.     Transfer of title to and possession of the Property shall become effective as of the Closing.

**6.     Payment of Purchase Price at Closing**

The Purchaser shall pay the balance at Closing in the form of a cashier's or other bank check made out to:

THE SECRETARY, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT.

The Closing will be held at a place, date and time established in accordance with Section 4 above.

7.    **Liquidated Damages**

Should Bidder fail or refuse to perform his/her obligations under this Acknowledgment for any reason (including but not limited to failure to establish the legal entity that is to take title in a timely manner that permits Closing within the deadline set forth in Section 4, the earnest money deposit and any extension fees, paid under Section 8, shall be retained by the Foreclosure Official and remitted to HUD as liquidated damages.

8.    **Extension Fees**

a.    Extensions of time to close the sale are within HUD's and the Foreclosure Official's sole and absolute discretion.

b.    Bidder acknowledges that it is prepared to meet all of the obligations required in this sale and is able to close the sale within the period set forth in Section 4. Inability to secure financing will not be considered a basis for granting an extension of the specified Closing deadline.

c.    The granting of extensions will be subject to the following conditions:

(1)    The Bidder must deliver, prior to the expiration of the 30-day Closing period, a written request to HUD or the Foreclosure Official stating the reason for the Bidder's inability to close on the purchase as scheduled.

(2)    Extensions shall be for 30 days.

(3)    For each 30 day period requested by Bidder and approved by HUD and/or the Foreclosure Official, extension fees shall be equal to $35.53, per unit,   per day, (the holding cost for such period) or one and one-half percent (1.5%) of the unpaid portion of the purchase price, whichever is greater.

(4)    These fees shall be retained by HUD and shall not be credited to the amount due from Bidder at Closing.  However, if Bidder closes prior to the expiration of an extension period, the prorated amount of the extension fee, for the unused portion of the extension period, shall be credited toward the amount due from Bidder at Closing.

(5)    The granting of one or more extensions shall not obligate HUD and/or the Foreclosure Official to grant additional extensions.

(6)    If any form or instrument required by the Invitation is not submitted within sufficient and reasonable time for HUD review or processing and such delay necessitates an extension of the Closing deadline, an extension fee must be paid for this period.

(7)    The Bidder must present extension fee(s) in the form of a cashier's or other bank check to the Foreclosure Official, at the time the extension is requested.

## 9.    Bidder Restrictions

a.    No Member of/or Delegate to Congress, or resident commissioner or local elected official, shall be admitted to any share or part of this sale, or to any benefit arising from it.  However, this provision does not apply to this sale to the extent that this sale is made with a corporation for the corporation's general benefit.

b.    If Bidder is or becomes suspended, debarred or temporarily denied from participating in HUD programs prior to closing, this sale shall be terminated.  In addition, if such suspension, debarment or temporary denial of participation occurs either before or after Bidder's execution of this Acknowledgment, any extension fees paid under Section 8 shall be retained by Seller as liquidated damages.

## 10.    As-Is Sale; No Representations

a.    Bidder shall accept the Property "as is."  HUD makes no representations or warranties concerning the physical condition of the Property.  In addition, HUD does not represent or warrant the number and occupancy of revenue producing units, or any factor bearing upon the value of the Property.

b.    Bidder acknowledges that the purchase price set forth in this Acknowledgment is based on Bidder's evaluation of the project and not upon any representations by HUD.  Bidder's failure to inspect, or to be fully informed as to any factor bearing upon the valuation of the Property, shall not affect the liabilities, obligations or duties of HUD, nor be a basis for termination of this sale or for the return of any extension fees paid pursuant to Section 8.

## 11.    Risk of Loss and Rights of Rescission

In the event of any substantial damage to the Project prior to closing by any cause (including but not limited to fire, flood, earthquake, tornado and significant vandalism) other than willful acts or neglect of Bidder, HUD, in its sole discretion, may negotiate with the Bidder for a reduction in the sales price corresponding to the estimated amount of damages.  Such damages shall be added to the Post-Closing Repair Requirements included in the Invitation. If  HUD and the Bidder are unable to agree on the amount by which the purchase price should be reduced or on the amendment to the repair requirements, Bidder may withdraw his/her bid, in which case HUD will direct the Foreclosure Official to return the earnest money deposit and any extension fee(s).

12. **Prorations**

    a.    Except as set forth in paragraph b. below, there will be no prorations at Closing. The Bidder will be responsible only for those expenses it incurs at the Project after Closing.

    b.    At Closing, the Bidder will pay the Foreclosure Official his/her prorata share of any property taxes on the Project which have been paid for a period of time ending after the date of Closing. The Bidder will be responsible for paying in full, all taxes, that come due after Closing. Taxes paid by the Bidder after Closing will not be prorated, even if those taxes are for a period, which began prior to Closing.

    c.    No later than 15 days before Closing, HUD will notify the Bidder of the amount the Bidder is to pay the Foreclosure Official as his/her prorata share of taxes.

13. **Security Deposits**

Notwithstanding State or local law, the Bidder will receive only those security deposits, which are on hand at the Project on the date of Closing. The Bidder will assume all liability under State and local law with respect to security deposits.

14. **Limitation of Liability**

Notwithstanding any other provisions of this sale, HUD's liability shall not exceed the amount of funds paid by Purchaser to HUD and/or the Foreclosure Official hereunder.

15. **Anti-Collusion Certification**

    a.  The Bidder certifies:

        (1)    The bid price in this offer has been arrived at independently, without (for the purposes of restricting competition) any consultation, communication, or agreement with any other Bidder relating to:

            (a)    the bid price;
            (b)    the intention to submit a bid price; or
            (c)    the methods or factors used in calculating the bid price offered;

        (2)    The bid price in this offer has not been and will not be knowingly disclosed by the bidder, directly or indirectly, to any other bidder or competitor before or during the actual time of the bid event, unless otherwise required by law; and

        (3)    No attempt has been made or will be made by the bidder to induce any other bidder to submit or not to submit a bid price for the purpose of restricting competition.

b.  If the bid procedure requires or permits written bids, each signature on the offer is considered to be certification by the signatory that the signatory:

(1)    Is the person in the bidder's organization responsible for determining the bid price being offered in this bid and that the signatory has not participated and will not participate in any action contrary to paragraph a. above; or

(2)    (a)    Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to paragraph a. above:

_____

_____

_____

[insert full name of person(s) in the bidder's organization responsible for determining the bid price, and the title of his or her position in the bidder's organization];

(b)    As an authorized agent, does certify that the principals named in the above have not participated, and will not participate, in any action contrary to paragraph a. above; and

(c)    As agent, has not personally participated, and will not participate, in any action contrary to paragraph a. above.

## 16.    Failure to Comply

Upon the failure or refusal of the Bidder to comply with any of the requirements listed above, HUD may declare the Bidder ineligible to purchase the Project, in which case Bidder shall forfeit his/her earnest money deposit and any extension fees paid.

## 17.    Severability

If for any reason one or more of the provisions contained in the Invitation, including this Acknowledgment, the Use Agreement, or any other attachments or exhibits thereto, shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of the Invitation, but the Invitation shall be construed as if such invalid, illegal or unenforceable provision had never been included therein.

**18.    Forms**

All forms and instruments referred to in this Acknowledgment are the standard HUD forms and instruments prepared by HUD and used by HUD in the jurisdiction in which the Property is located and shall contain such additional covenants and conditions required by the Invitation for Bid or Request for Proposals.

**19.    Execution**

a.    By his/her signature below and initials on all riders hereto, Bidder indicates his/her acknowledgment of and agreement to the terms and requirements of this foreclosure sale.

b.    In the case of a bid submitted by an agent or representative of the Bidder, the signatory attests that it is duly authorized to submit his/her bid on behalf of the Bidder and to execute this Acknowledgment.

WARNING:  It is a crime to knowingly make false statements to the United States in this document or any other document related to this sale.  Penalties upon conviction can include a fine or imprisonment.  For details see:  Title 18 U.S. Code, Section 1001 and Section 1010.

Executed by the Bidder on the _____ day of _____, 2002.

Witness:_____          By: *Robert Almeida + Jaison Joseph*

Typed Name:_____          Typed Name:_____

*153 Montgomery Ave*

Address:

*Scarsdale, N.Y. 10583*

City, State, Zip

*914 - 244 - 9300* *x124*

Phone No. with Area Code:

*914  557 - 4804*        *914-584-8*



JAMES B. COMEY
United States Attorney for the
Southern District of New York
By: ANDREW D. O'TOOLE (AO-7714)
Assistant United States Attorney
100 Church Street, 19th Floor
New York, New York  10007


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JAISON JOSEPH, successful bidder,                    :

                    Plaintiff,                        :

                    - against -                       :              No. 02 Civ. 6133 (CLB)

JOHN CARRO, as Foreclosure                            :
Commissioner acting on behalf of
the Secretary of the Department                       :
of Housing and Urban Development,
HON. MEL MARTINEZ, as Secretary                       :
of the U.S. DEPARTMENT OF HOUSING
AND DEVELOPMENT, and ROBERT                           :
ALMEIDA, successful bidder,
                                                      :
                    Defendants.
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## STIPULATION OF SETTLEMENT AND DISMISSAL

WHEREAS, on or about July 31, 2002, Jaison Joseph ("Joseph") commenced this

action seeking a declaratory judgment and injunction against the United States Department of

Housing and Urban Development ("HUD"), its Secretary, Hon. Mel Martinez (the "Secretary"),

and Hon. John Carro, HUD's designated foreclosure commissioner (the "foreclosure

commissioner") (collectively, the "HUD Defendants") and Robert Almeida ("Almeida"): (1)

challenging HUD's right to declare Joseph and Almeida in default under the agreement whereby

Joseph and Almeida, as the high bidders at the foreclosure sale of the property and assisted living facility located at 51 Mountainview Avenue, Nyack New York ("Tappan Zee Manor"), and (2) seeking to require the defendants to perform under that agreement, claiming jurisdiction under the Administrative Procedures Act, 5 U.S.C. § 702 (the "APA"); and

WHEREAS, on July 31, 2002, Joseph obtained an ex parte temporary restraining order from this Court enjoining the HUD defendants from "declaring the plaintiff under default under the 'Terms and Requirements of Foreclosure Sale-Acknowledgment of Bidder, executed on April 26, 2002'" ("Bid Acknowledgment"); and

WHEREAS, on or about August 15, 2002, Joseph filed an amended complaint; and

WHEREAS, on September 19, 2002, the HUD Defendants filed their opposition to the Order to Show Cause and filed their cross motion seeking to dismiss the amended complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1);

IT IS HEREBY STIPULATED AND AGREED AS FOLLOWS:

1.    The temporary restraining order is vacated and the amended complaint is dismissed with prejudice.

2.    Joseph expressly agrees to assign to Almeida any and all claim or interest he may have, or any silent partner of his may have, in the bid for Tappan Zee Manor, which was submitted to HUD's foreclosure commissioner on April 26, 2002, and any and all claims or interest in any and all extension fees paid to HUD since April 26, 2002, and any rights he or any silent partner of his may have under federal, state or local law to recover same. See Assignment of Foreclosure Bid, executed September 20, 2002 (copy attached).

2

3.   Almeida shall forward a copy of the Assignment of Foreclosure Bid to the foreclosure commissioner no later than September 25, 2002 for HUD's approval.

4.   Joseph expressly represents that he has no agreement, oral or written, express or implied, that would impede his ability to assign his interest in the subject property.

5.   Almeida shall deliver to Joseph $100,000 by bank check payable to the "Law Offices of Jeffrey S. Greene, as attorney," no later twenty-four (24) hours after HUD approves the Assignment of Foreclosure Bid, which sum shall be in full settlement of any and all claims that Joseph, and his agents, successors, and/or affiliates now have or may hereafter acquire against Almeida based on the bid jointly submitted by Joseph and Almeida at the foreclosure sale held on April 26, 2002, and/or related to the Tappan Zee Manor property, and in fair consideration of Joseph's execution of the Assignment of Foreclosure Bid.  Upon remittance of said consideration, Joseph and Almeida shall exchange written mutual releases of all claims or causes of actions each may have against one another related to the bid and the Stipulation and Order.

6.   Almeida expressly agrees that he must close pursuant to the Bid Acknowledgment at 9:00 a.m. Friday, October 4, 2002, and further that if for any reason Almeida fails to perform at 9:00 a.m. on October 4, 2002, he waives all claims and rights under their bid at the foreclosure sale held on April 26, 2002 or under the Bid Acknowledgment and/or any right or claim to close or take possession of the Tappan Zee Manor property.

7.   The closing on the Tappan Zee Manor property shall take place Friday, October 4, 2002 at 9:00 a.m. at the law offices of the foreclosure commissioner located at CARRO, VELEZ, CARRO & MITCHELL, LLP, 477 Park Avenue South, 16th Floor, New York, New York 10016.

3

On that date, the foreclosure commissioner's deed shall be available for delivery.

8.    Joseph and Almeida expressly agree that HUD has complied with the Multifamily Mortgage Foreclosure Act of 1981, and waive all claims and/or objections to the title that will be conveyed by the foreclosure commissioner at closing.

9.    If for whatever reason Almeida fails to perform on Friday, October 4, 2002, HUD shall declare Joseph and Almeida in default, and Joseph and Almeida expressly agree to waive all claims or rights to the Tappan Zee Manor property or under their bid and agree that they will not take any action, either individually or in concert with any individual or entity, seeking to challenge HUD's right to foreclose on the property and/or transfer title in the property to a third party.

10.   Joseph and Almeida and any successor and/or assignee expressly agree that the United States of America, including its agencies and employees, and the foreclosure commissioner are released from any and all of their claims and liability arising from or relating to the foreclosure sale, their joint bid, the closing or their right to Tappan Zee Manor property. However, notwithstanding the above, Almeida expressly reserves any and all of his rights he may have to commence an action against the United States in the Court of Federal Claims or any court of competent jurisdiction for any claims he may have against the United States for the monies paid as extension fees, and the United States reserves any and all defenses to such claims.

11.   Nothing contained in this Order shall be construed to create rights of third parties for or against the Government not otherwise provided by law.

4

12.    Nothing contained in this Stipulation and Order is intended or shall be construed as a waiver by the United States or its agencies of their right to institute any type of administrative, criminal or civil investigation or action against any party or signatory to this Stipulation and Order for any past, present or future violations of any statutes, rules or regulations administered by the United States or its agencies. Nor does this agreement otherwise relieve any party or signatory of its duties, responsibilities and obligations to comply with any federal, state and local laws and regulations.

13.    Nothing in this Stipulation and Order, nor the agreements contained herein, shall be construed as an acknowledgment or admission by either party of the validity of the claims asserted in this action nor of any defense, including lack of subject matter jurisdiction, nor provide any third party with jurisdiction to commence any action against the United States, its agencies, agents or employees.

14.    Each signatory to this Stipulation and Order hereby represents that he or she is authorized to sign on behalf of the party indicated, and that she or he is fully authorized to bind the party to all terms contained herein.

15.    Nothing in this Stipulation and Order shall be construed as setting any precedent with respect to any loan foreclosed pursuant to the Multifamily Mortgage Foreclosure Act of 1981.

16.    The parties understand and agree that this Stipulation and Order contains the entire agreement between and among the parties, and that no statements, representations, promises, agreements, or negotiations, oral or otherwise, between or among the parties or their counsel shall be of any force or effect.

17. The Clerk of the Court will close this case, and the parties shall bear their own costs and attorney's fees in this action. However, this Court shall retain jurisdiction over all matters and disputes arising under or with respect to this Stipulation and Order.

Dated: White Plains, New York
September 20, 2002

LAW OFFICES OF JEFFREY S. GREENE, P.C.
Attorney for Jaison Joseph

By: _____

JEFFREY S. GREENE, ESQ. (JSG 9941)
One Barker Avenue, Second Floor
White Plains, New York 10601
Telephone: (914) 686-5091

Dated: White Plains, New York
September 20, 2002

ROBINOWITZ, CONLAN & DUBOW, LLP
Attorney for Robert Almeida

By: _____

JUDITH REARDON, Esq. (JR-7320)
199 Main Street
White Plains, New York 10601
Tel.: (914) 949-2826

6

Dated: White Plains, New York
September 20, 2002

JAMES B. COMEY
United States Attorney for the
Southern District of New York
Attorney for the HUD Defendants

By: _____
ANDREW D. O'TOOLE (AO-7714)
Assistant United States Attorney
100 Church Street, 19th Floor
New York, New York 10007
Temp. Telephone: (718) 422-5668

SO ORDERED:

_____
HONORABLE CHARLES L. BRIEANT
UNITED STATES DISTRICT JUDGE

Dated: September _____, 2002

## ASSIGNMENT OF FORECLOSURE BID

I, Jaison Joseph, a joint bidder with Robert F. Almeida at the HUD foreclosure sale held on April 26, 2002 of the Tappan Zee Manor property located at 51 Moutainview Avenue, Nyack, New York, 10960, hereby assign to Robert F. Almeida for good and valuable consideration ($100,000) any and all of my rights and interests in the high bid submitted by Robert F. Almeida and me, and any and all other claims that I have or may have in the Tappan Zee Manor property.

Dated: White Plains, New York
       September 20, 2002

_____
JAISON JOSEPH

Sworn to before me
this 20th day of September, 2002

_____

JUDITH REARDON
Notary Public, State of New York
No. 494-3226
Qualified in Westchester County
Commission Expires _8/17/0_ 2

## ATTACHMENT C
## FORECLOSURE SALE USE AGREEMENT

*THE EXCHANGE AUTHORITY, LLP AS TRUSTEE OF THE ALMEDA/PARKFIELD*
*EXCHANGE TRUST, A MASSACHUSETTS*
This Agreement is entered into by *TRUST AND PONDVIEW CORP. AS TENANTS*
("Purchaser") and the Secretary of Housing and Urban Development ("Secretary" *IN COMMON*
or "HUD").

WHEREAS, pursuant to the provisions of the Multifamily Mortgage Foreclosure Act, 12 U.S.C. Sections 3701 et seq. (the "Act"), and the Department of Housing and Urban Development's regulations thereunder at 24 C.F.R. Part 27, the Secretary has elected to exercise the nonjudicial power of sale provided under the Act, or pursuant to a judicial foreclosure the Secretary has elected to apply Section 367(b) of the Act, with respect to Tappan Zee Manor, HUD Project No. 012-43180, (the "Project" or the "Property") a legal description of which is attached as Exhibit "A"; and

WHEREAS, pursuant to the Act and to provisions of 12 U.S.C. Section 1701z-11 et seq, Management and Preservation of HUD-Owned Multifamily Housing Projects, and the Department of Housing and Urban Development regulations thereunder at 24 CFR Part 290, the Secretary has authority to impose certain use restrictions, as set forth in this Agreement, on the property subject to a mortgage held by the Secretary that is sold at foreclosure to a purchaser other than HUD;

WHEREAS, by Deed executed this _4th_ day of _October_, 2002, by _CARRO VELEZ, CARRO & MITCHELL L.L.P._, the Project has been conveyed to the Purchaser; and

NOW THEREFORE, in consideration of the mutual promises set forth herein and in further consideration of the sale of the Project to the Purchaser, the parties agree as follows:

## 1.    TERM OF AGREEMENT

This Agreement shall be in effect:

[X]    twenty (20) years from the date of this Agreement or until no longer operated as a nursing home or assisted living facility.

[ ]    until _____/_____/_____.

## 2.    CONVEYANCE OF PROJECT

During the term of this Agreement, any conveyance of the project must have prior written approval of HUD. HUD's approval of conveyance and/or the proposed purchaser's management of the property will be based on information provided in written statements of how the purchaser, or any subsequent purchaser, in consideration of any and all existing use restrictions, will:

(a)    Implement sound financial and physical management program;
(b)    Respond to the needs of the tenants and work cooperatively with resident organizations;
(c)    Provide adequate organizational staff and resources to manage the project.

## 3.    SUBJECT TO EXAMINATION

The Project shall at all times, a) be maintained in decent, safe and sanitary condition to the greatest extent possible, b) maintain full occupancy to the greatest extent possible, and c) be maintained as rental housing for the term of this Agreement. At the request of the Secretary, Purchaser must supply evidence by means of occupancy reports, physical condition reports, reports on operations, or any evidence as requested to ensure that the above requirements are being met.

## 4.    UNIT NUMBER OR USE CHANGE

Changes to the use or number of residential units in the Project; e.g., apartment units, beds in a care facility, from the use as of the date of this Agreement, must receive the written prior approval of HUD.

## 5.    NON-DISCRIMINATION REQUIREMENTS

The Purchaser will comply with the provisions of all Federal, State, or local laws prohibiting discrimination in housing.

## 6.    HAZARD INSURANCE

Hazard insurance shall be maintained in an amount to ensure that the Purchaser is able to meet the rental housing requirements described in this Agreement.

## 7.    DESTRUCTION OF PROJECT

In the event that any or all of the Project is destroyed or damaged by fire or other casualty, the money derived from any insurance on the Project shall be applied to rebuild or replace the property destroyed or damaged, unless the Secretary gives written approval to use insurance proceeds for other purposes.

8.    **DEMOLITION OF PROJECT PROPERTY**

The Purchaser will not demolish any part of the Project or withdraw any part of the Project from use (except as temporarily necessary for routine repairs), without the prior written approval of HUD.

9.    **REMEDIES FOR NONCOMPLIANCE**

Upon any violation of any provision of this Agreement by the Purchaser, HUD may give written notice thereof to the Purchaser by registered or certified mail, addressed to the address stated in this Agreement, or such other address as subsequently, upon appropriate written notice thereof to the Secretary, may be designated by the Purchaser as its legal business address. If such violation is not corrected to the satisfaction of the Secretary within 30 days after the date such notice is mailed or within such further time as HUD reasonably determines is necessary to correct the violation, without further notice, HUD may declare a default under this Agreement and may apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of this agreement, for the appointment of a receiver to take over and operate the Project in accordance with the terms of this Agreement, and/or such other relief as may be appropriate, since the injury to the Secretary arising from a default of the terms of the Agreement would be irreparable and the amount of damage would be difficult to ascertain.

The availability of any remedy under the Agreement shall not preclude the exercise of any other remedy under any provision of the law, nor shall any action taken in the exercise of any remedy be considered a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not construe a waiver of the right to exercise that or any other right or remedy at any time.

10.    **SUCCESSORS AND ASSIGNS**

This Agreement is binding upon the Purchaser's heirs, successors and assigns. The Purchaser agrees that if title to the Project is conveyed during the term of this Agreement, the Purchaser will require its grantee to assume in writing its obligations under this Agreement.

11.    **RESTRICTIONS**

No Member of Congress or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of the benefits of the Use Agreement, but this provision shall not be construed to extend to this Use Agreement if the Use Agreement is made with a corporation for its general benefit.

12.    **CONTRADICTORY AGREEMENTS**

The Purchaser certifies that it has not, and agrees that it will not, execute any other agreement with provisions contradictory of, or in opposition to, the

provisions of this agreement, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth herein and supersede any other requirements in conflict with this Agreement.

## 13.    SEPARABILITY

The invalidity of any provision of this Agreement shall not affect the validity of the remaining provisions hereof.

**14.    AMENDMENT**

This Agreement may be amended by the mutual written consent of the parties, except those provisions required by statute.

15. It is acknowledged but the Foreclosure commission has not transferred possession of the premises to the Purchaser and that neither the Foreclosure commission holds in does payments as adequate from the tenants trust are being transferred to the Purchaser

IN WITNESS WHEREOF:

The Purchaser has executed this Use Agreement in triplicate this _____ 4 _____ day of _____ October _____, 2002.

WITNESS:                                    PURCHASER:

_____          _____
                                           By:  Signature

_____          ROBERT F. ALMEIDA
                                           Typed Name of Purchaser

                                           33 HUBBELLS DRIVE
                                           Street Address

                                           Mount Kisco N.Y. 10549
                                           City, State, Zip Code


The U.S.   Department of Housing and Urban Development (HUD) has executed this Use Agreement in triplicate this _____ 2nd day of _____ OCTOBER _____, 2002.

WITNESS:                                    FOR:  THE SECRETARY OF HOUSING
                                                  AND URBAN DEVELOPMENT

Ewell H. Elliott, Jr                        BY: _____

Jennifer M Hurbern

                                           William H. Melvin
                                           Official's Typed Name

                                           Director, Atlanta M/F PD Center
                                           Title

RIDER 1 OF 3

RELOCATION
NURSING HOMES, BOARD AND CARE FACILITIES and/or ASSISTED LIVING
FACILITIES (ALF)

The Use Agreement shall include the following provisions:

<u>Facility Closure or Change in Use:</u>

The property conveyed by this sale may require a license to operate that is granted by the applicable state and/or local authority responsible for oversight of this type of facility. If the Purchaser is unable to secure the required operating license from the applicable state and/or local authority, or the Purchaser chooses to change the use of the facility and cease the provision of current services, the Purchaser covenants that any residents receiving the services currently provided by the facility, and who are current in their fees on the date of this Use Agreement, shall receive sixty (60) days advance notice of the date on which the services currently provided by the facility will be terminated.

<u>Relocation:</u>

If the operation of the facility is terminated because of an inability to secure appropriate licensing, or a cessation of the services currently provided, the Purchaser covenants that it will:

(1)     if required under state and/or local procedures, secure the services of a licensed administrator to oversee the relocation of all residents;

(2)     provide assistance to residents in locating a facility that is decent, safe, sanitary and in good repair and that will provide the same services currently received and which, to the extent feasible, shall be in a location not generally less desirable than the Property, and pay for the expenses of moving;

HUD will not provide the Purchaser with any funds or subsidy with which to pay for the requirements of this Rider.

By initialing hereunder the parties acknowledge that this Rider is incorporated into and is a part of the Use Agreement.

PURCHASER _RA_

SECRETARY OF HOUSING AND URBAN DEVELOPMENT _UM_

RIDER 2 OF 3

ASBESTOS HAZARDS

The Use Agreement shall include the following provisions:

(1)  Purchaser agrees to indemnify defend, and hold Seller harmless from any liability arising by reason of Purchaser's failure to perform Purchaser's obligations under this Deed with respect to the elimination of asbestos health hazards, the prohibition against the use of asbestos and Purchaser's responsibility for complying with applicable State and local asbestos laws and regulations.

(2)  If temporary or permanent relocation is necessary because of such rehabilitation, Purchaser covenants that it will comply with Section 203(f) of the Housing and Community Development Amendments of 1978, as amended, 12 USC §1701z-11(f), and the regulations thereunder, 24 CFR §§290.45 and 290.47, as explained in paragraphs 4 through 6, below.  Additionally, the Purchaser covenants that it will comply with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, 42 USC §4601, and the regulations thereunder, 49 CFR Part 24, when Project-based Section 8 assistance is provided by the Seller.  The Purchaser is responsible for ensuring compliance with the Act and Regulations, notwithstanding any contractual obligations with third parties to comply with the Act and Regulations.  Purchaser covenants that it will provide advance written notice of the expected displacement.  The notice shall be provided as soon as feasible, describe the assistance and the procedures for obtaining the assistance, and contain the name, address and phone number of an official responsible for providing the assistance.

(3)  If temporary relocation is necessary because of such rehabilitation, Purchaser covenants that it will provide assistance to tenants in locating a decent, safe and sanitary dwelling/housing unit which, to the extent feasible, shall be in a location not generally less desirable than the Property, and reimburse tenants for:

      (a)    Expenses of moving and any net increase in monthly housing  cost (rent and reasonable utility costs) during the temporary displacement period.

      (b)    Expenses of returning to a repaired unit on the Property.

(4)  If permanent relocation is necessary because of such rehabilitation, Purchaser covenants that it will provide assistance, as described below, to tenants, as may be appropriate:

(a)     Advisory services, necessary to locate decent, safe and sanitary and affordable replacement housing which, to the extent feasible, shall be in a location not generally less desirable than the Property.

(b)     Reimbursement for reasonable moving expenses, which need not exceed an amount determined by Seller to be reasonable considering the size of the household  and the circumstances surrounding the move.

(5)  The Purchaser covenants not to increase the rent for any units, from the rent Seller is requiring a tenant to pay on the Closing date, until such unit meets all the rehabilitation requirements set forth in (1), above.  (In addition, rent for units to be covered by a Housing Assistance Payments Contract may be increased only pursuant to and following execution of such Contract.)

(6)  If Purchaser fails to comply with (1), above, and no extension by written agreement has been granted by Seller, Seller and his successors in office shall be entitled to enter and terminate the estate hereby conveyed.

        By initialing hereunder the parties acknowledge that this Rider is incorporated into and is a part of the Use Agreement.

PURCHASER

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

RIDER 3 OF 3

LEAD-BASED PAINT HAZARDS

The Use Agreement shall include the following provisions:

(1)    In order to comply with 42 USC §§4821-4886 and the regulations thereunder, 24 CFR Part 35, Subpart E and §200.825 (the "Regulations"), Purchaser covenants that any lead-based paint hazards will be abated in accordance with the Regulations.  Purchaser shall certify to Seller (in a form acceptable to Seller) and Seller shall determine, through its inspection (or at its discretion, the inspection and certification of a local government official) that all lead based-paint hazards have been removed from the Property in accordance with the Regulations.

(2)    Purchaser understands and agrees that Seller's inspection and finding of satisfactory performance is not intended to and does not constitute a guarantee that all lead based-paint and all potential lead-based paint hazards have been eliminated from the Property and does not relieve Purchaser of its ongoing responsibility for complying with all applicable State and local lead based-paint laws and regulations.

(3)    Purchaser agrees to indemnify defend, and hold Seller harmless from any liability arising  by reason of Purchaser's failure to perform Purchaser's obligations under this Deed with respect to the elimination of lead based-paint health hazards, the prohibition against the use of lead based-paint, and Purchaser's responsibility for complying with applicable State and local lead based-paint laws and regulations.

(4)    If temporary or permanent relocation is necessary because of such abatement, Purchaser covenants that it will comply with paragraphs 5 through 8, below.  Additionally, the Purchaser covenants that it will comply with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Act"), as amended, 42 USC §4601, and the regulations thereunder, 49 CFR Part 24, when Project-based Section 8 assistance is provided by the Seller.  The Purchaser is responsible for ensuring compliance with the Act and regulations thereunder, notwithstanding any contractual obligations with third parties to comply with the Act and regulations.  Purchaser covenants that it will provide advance written notice of the expected displacement.  The notice shall be provided as soon as feasible, describe the assistance and the procedures for obtaining the assistance, and contain the name, address and phone number of an official responsible for providing the assistance.

(5)    If temporary relocation is necessary because of such abatement, Purchaser covenants that it will provide assistance to tenants in locating a decent, safe and sanitary dwelling/housing unit which, to the extent feasible, shall be in a location not generally less desirable than the Property, and reimburse tenants for:

(a)    Expenses of moving and any net increase in monthly housing cost (rent and reasonable utility costs) during the temporary displacement period.

(b)    Expenses of returning to a repaired unit on the Property.

(6)    If permanent relocation is necessary because of such abatement, Purchaser covenants that it will provide assistance, as described below, to tenants, as may be appropriate:

(a)    Advisory services, necessary to locate decent, safe and sanitary and affordable replacement housing which, to the extent feasible, shall be in a location not generally less desirable than the Property.

(b)    Reimbursement for reasonable moving expenses, which need not exceed an amount determined by Seller to be reasonable considering the size of the household size and the circumstances surrounding the move.

(7)    The Purchaser covenants not to increase the rent for any units, from the rent Seller is requiring a tenant to pay on the Closing date, until such unit meets all the abatement requirements set forth in (1), above.  (In addition, rent for units to be covered by a Housing Assistance Payments Contract may be increased only pursuant to and following execution of such Contract.)

(8)    Purchaser agrees to comply with Section 35.88 "Disclosure Requirements for Sellers and Lessors" and Section 35.92 "Certification and Acknowledgment of Disclosure" of 24 CFR - *Lead-Based Paint Poisoning Prevention in Certain Residential Structures.*

(9)    If Purchaser fails to comply with (1), above, and no extension by written agreement has been granted by Seller, Seller and his successors in office shall be entitled to enter and terminate the estate hereby conveyed.

By initialing hereunder the parties acknowledge that this Rider is incorporated into and is a part of the Use Agreement.


PURCHASER

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

# LYNCH SCHWAB

PLLC

Attorneys & Counselors
At Law

ALBANY · SYRACUSE · WHITE PLAINS

Louis U. Gasparini, Esq.
Member
lgasparini@lynchschwab.com
Direct Dial: (914) 372-1045
Direct Fax: (914) 620-1715

February 6, 2008

Jennifer H. Harry, Esq.
Attorney-Advisor
U.S. Department of Housing & Urban Development
Office of Counsel
40 Marietta St.
Atlanta, GA 30303

Re: **Tappan Zee Manor Assisted Living Facility
Nyack, New York**

Our File: **300.011**

Dear Ms. Harry:

Our firm represents Robert Almeida, the successful bidder at the foreclosure sale of the property and licensed adult home located at 51 Mountainview Avenue, Nyack, New York (hereinafter referred to as "Tappan Zee Manor"). In connection with this sale, my client entered into various agreements with the U.S. Department of Housing and Urban Development (hereinafter "HUD"). Due entirely to the breach of these agreements by HUD, my client has sustained serious monetary damages.

The facts underlying this dispute arose in 2002, following HUD's acceptance of the Almeida bid. The appointed Foreclosure Commissioner contacted all interested parties to advise that the closing of the Tappan Zee Manor property was to take place on June 14, 2002. However, objections were raised to the closing date because HUD failed to satisfy specific statutory compliance and title issues. In addition, it was evident that HUD failed to properly serve the Internal Revenue Service. Based upon the foregoing, HUD could not deliver title for Tappan Zee Manor, as required under the various agreements and statute. My client conducted a separate title search as well, that revealed that HUD failed to comply with requirements of the Multifamily Mortgage Foreclosure Act. It was also evident that questions existed as to the validity of any non-judicial foreclosure sale.

2

As a result, the closing did not take place, due entirely to HUD's own breach of the various agreements. Despite this, Mr. Almeida and his co-bidder were required to pay an "Extension Fee" of $106,950.00 on June 14, 2002. This "Extension Fee" was paid under protest.

Concerning the service issues to the Internal Revenue Service, HUD failed to remedy this error until July 17, 2002. Mr. Almeida tried repeatedly to schedule a closing the next week. He was prepared to close with either fifty or one-hundred percent of the purchase price if his co-bidder would not close. HUD requested that my client furnish an indemnity agreement to close on his own, but then rescinded when he consented. HUD then required that Mr. Almeida pay another "Extension Fee" in the amount of $56,848.00 on July 17, 2002, as HUD refused to close. Once again, this "Extension Fee" was paid under protest.

At the time the second "Extension Fee" was taken by HUD, HUD was in violation of various agreements entered into with Mr. Almeida. Further, HUD could not deliver title in accordance with federal statute. These issues were raised to HUD prior to the application of the "Extension Fee" and included but were not limited to: (a) whether the Foreclosure Commissioner had the statutory authority to issue the Notice of Default and Foreclosure Sale; (b) whether the mortgagor had properly been divested of its interests; and (c) whether the federal tax liens had been discharged. Despite these clear deficiencies with the title, Mr. Almeida was fully prepared to close; was fully prepared to grant HUD an indemnity agreement; and was fully prepared to satisfy his co-bidder's share of the bid. HUD refused, and in doing so breached the various agreements.

Thereafter, Mr. Almeida's co-bidder obtained an ex-parte stay order from federal court in the Southern District of New York. An agreement was reached by my client; the co-bidder; the U.S. Attorney; and was So-Ordered by the Court. A new date of October 4, 2002 was set to close. Indeed, my client was fully willing and able to close before this date.

Mr. Almeida has made several efforts to seek reimbursement of the "Extension Fee's", which total $163,798.00. Despite his good faith efforts, HUD has failed to reimburse him. The payment of these fees was made under protest, and with the expectation that a refund would be forthcoming in the future.    After all, HUD required that my client pay these fees at a time when HUD could not pass title in accordance with the various agreements entered into between the parties, and in clear violation of the Multi Family Mortgage Foreclosure Act and the National Housing Act.

Based upon these facts, we request that HUD reimburse Mr. Almeida the "Extension Fee's" he has paid to HUD. Because the applicable statute of limitations is approaching, we request that a decision be made by HUD no later than February 15, 2008. Otherwise, my client has instructed me to proceed with appropriate legal proceedings to obtain the monies he was required to pay, and the interest due thereon.

Please contact me to discuss this matter further. If you have further questions, or require additional information, please do not hesitate to contact me directly.

3

Very truly yours,

LYNCH SCHWAB, PLLC

BY

LOUIS U. GASPARINI

cc://

Mr. Robert Almeida

Law Office of Vincent Cuono
33 Hubbells Drive
Mount Kisco, NY 10549



U.S. Department of Housing and Urban Development

Atlanta Multifamily Property Disposition Center
Five Points Plaza
40 Marietta St.
Atlanta, Georgia 30303-2806

February 14, 2008

Louis U. Gasparini, Esq.
Lynch Schwab PLLC
75 South Broadway
Fourth Floor
White Plains, NY 10601

Dear Mr. Gasparini:

Subject: Tappan Zee Manor Assisted Living Facility
Nyack, NY

This is in response to your February 6, 2008 letter to Ms. Jennifer Harry. A review of the project file has been conducted by HUD's Office of Counsel. It is HUD's determination that there are insufficient legal grounds to return the extension fees that were paid for failure to close in a timely manner.

Sincerely,

William H. Melvin
Director,
Atlanta Multifamily
Property Disposition Center